# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 3, 2010

## STATE OF TENNESSEE v. AARON MALONE

### Direct Appeal from the Criminal Court for Shelby County
### No. 08-02332     James C. Beasley, Jr., Judge

---

### No. W2009-02047-CCA-R3-CD  - Filed March 22, 2011

---

A Shelby County jury convicted the defendant, Aaron Malone, of first degree murder, and he received a life sentence in the Tennessee Department of Correction.  On appeal, the defendant argues that (1) the trial court erred by denying his motion to suppress his statement, arguing that (a) he did not waive his rights knowingly, voluntarily, and intelligently and (b) that the court should have suppressed the statement under the "fruit of the poisonous tree" doctrine after ruling that his arrest was illegal; (2) the trial court erred by admitting the victim's teeth into evidence; and (3) the trial court erred by allowing a state witness, qualified as an expert in crime scene investigation, to testify about blood spatter analysis.  Following our review, we affirm the judgment of the trial court.

#### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

J.C. MCLIN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Mark Mesler, Memphis, Tennessee, for the appellant, Aaron Malone.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Pamela Fleming and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

On April 8, 2008, a Shelby County grand jury indicted the defendant, Aaron Malone, and the co-defendant, Calvin Nelson, for the murder of Hako Velich during an attempt to perpetrate a robbery.

## I. Suppression Hearings

Prior to trial, the defendant presented two motions to suppress his statement. His first motion alleged that he was under the influence of marijuana when interviewed by police; therefore, his waiver of his *Miranda* rights was not voluntary, knowing, or intelligent. His second motion alleged that the court should exclude his statement because it arose due to an improper arrest. On August 21, October 2, and October 24, 2008, the court held suppression hearings, at which the parties presented the following evidence.

*State's Proof.* Memphis Police Officer Joe Stark testified that he was the case coordinator for the investigation into the victim's death. He explained that he developed the defendant as a suspect based on the co-defendant's identification of the defendant, various witness statements, and video surveillance tapes of the defendant on the night of the victim's murder. Officer Stark testified that none of the witnesses were able to tell police where the defendant lived.

On cross-examination, Officer Stark agreed that he secured neither a search warrant for any residence where the defendant might have been nor an arrest warrant for the defendant.

Memphis Police Sergeant Anthony Mullins testified that he interviewed the defendant after police took the defendant into custody. Sergeant Mullins said that he had the defendant read aloud the advice of rights form, and the defendant did not have any difficulty reading the form. He stated that the defendant was "kind of unkempt, but he was alert. He was basically cooperative during the entire process . . . , and he seemed to be pretty clear[-]headed, lucid." Sergeant Mullins testified that nothing in his interaction with the defendant led him to believe that the defendant was not in control of his faculties or intoxicated in any way.

On cross-examination, Sergeant Mullins testified that the defendant had said that he had smoked marijuana "about two hours before he was even arrested . . . [w]hich was about three hours before [they] talked to him." Sergeant Mullins stated that it might have been up to five hours between when the defendant smoked the marijuana and when he interviewed him. He testified that it took six and a half hours to begin typing the defendant's written statement because the defendant told "elaborate" lies, they took breaks, and they took time to attempt to verify what the defendant told them. Sergeant Mullins said that it was

necessary to tell the defendant parts of what the police already knew so that the defendant would realize that the police were not merely guessing about his involvement.

Detective Jason Bartlett, of the Shelby County Sheriff's Office, testified that the Memphis Police Homicide Unit requested that the sheriff's office assist them in locating the defendant. Detective Bartlett said that his research on the defendant led him to a residence on Auburn Road. He and his team went to that address. Detective Bartlett testified that they

> knocked on the door, and . . . a young, adult, male black . . . answer[ed] the door. [They] identified [themselves] to the young adult. [They] were in gear that said Sheriff on it. And [they] showed the young male black a picture of [the defendant] and asked him if he knew him and the subject identified that he did know him. [They] asked if [the defendant] was inside the residence and the young male black said . . . he was. And [they] asked him where he was and . . . he pointed towards the back of the residence on the inside. At that time, the young male black . . . stepped out of the way of the doorway allowing [them] access into the residence.

Detective Bartlett said that they found the defendant lying on a bed and handcuffed him. He stated that they did not search the residence.

On cross-examination, Detective Bartlett said that the person who answered the door appeared to be at least eighteen years old. He agreed that he did not ask the person who he was, whether he had permission to grant access to the home, or to sign a consent to search form. Detective Bartlett testified that he did not encounter anyone else in the house and did not recall anyone asking him whether he had a warrant.

*Defense Proof.* Geraldine Maldrough testified that in September 2007, she lived on Auburn Road with her sister, Edna Elrod, and Ms. Elrod's two grandsons, Lindsey and Delvon. Ms. Maldrough recalled that on a Monday during the day, Delvon came to her room, which was in an attached mother-in-law suite, and told her that the police where there looking for the defendant. She went to the front of the house and asked an officer whether they had a warrant. The officer replied that they did not need a warrant. Ms. Maldrough said that by that time, they were taking the defendant out of the house. She said that she saw more than four officers. Ms. Maldrough testified that Delvon was fourteen years old at the time.

The defense called Detective Bartlett, who testified that he did not recall having a conversation with the defendant about whether the defendant was under the influence of any drugs. He stated that he had reviewed a videotape of when he walked the defendant into the

homicide office. Detective Bartlett testified that the tape recorded his making a statement that the defendant had told the officers that they were ruining his high.

Edna Elrod testified that she was a friend of the defendant and that they had dated from 1998 until 2001. She said that she lived on Auburn Road with her sister, her son, and her grandsons, Lindsey and Delvon. Ms. Elrod stated that Delvon was fourteen years old in September 2007. She testified that the defendant had been staying with her for approximately one week before his arrest.

In its order denying the defendant's motion to suppress his statement, the court found that the defendant's arrest was illegal because (1) the defendant was an invited guest, (2) the police did not have a warrant, (3) they did not have valid consent to enter, and (4) there were no exigent circumstances. Under the precedent of *New York v. Harris*, 495 U.S. 14 (1990), the court ruled that the exclusionary rule did not require that the defendant's statement be suppressed because the police had probable cause for arresting the defendant and they did not obtain his statement by exploiting the unlawful entry.

## II. Trial

The parties presented the following evidence at the defendant's July 2009 trial. Joseph Zeller testified that he owned Tiger Truck Lines and that the victim began working for the truck line six to seven years before the trial. Mr. Zeller stated that the victim was in Memphis, Tennessee, between September 16 and September 17, 2007, because he was delivering a load of appliances to a warehouse. Mr. Zeller identified a picture of the victim's truck outside of a warehouse in Memphis, and he said that he was familiar with the truck because he bought it from the victim's widow after his death. He testified that a person standing on the ground would not be able to look into the truck's window, which was six and a half to seven feet off the ground. Mr. Zeller identified two Comcheck cards, which had "Tiger Truck Lines, New Albany, Indiana" on the front. He said that he knew the victim used those two cards because the card numbers matched the bill associated with the victim's truck and because the victim signed the receipts.

Ricky Cole testified that on September 17, 2007, he was working at Serpro, a warehouse located at 3835 Knight Road in Memphis, Tennessee. He said that he saw a truck parked at the warehouse that he recognized as belonging to a truck driver that regularly delivered to Serpro. Someone informed him that the truck had a broken window, so he went to investigate. He testified that he knocked on the door, and when no one answered, he opened the door and discovered the victim's body lying in the aisle of the truck. Mr. Cole said that he did not notice anything unusual about the truck other than the broken glass and did not notice signs of blood. He testified that he called 911 immediately after finding the victim.

-4-

Memphis Police Officer Shaun Tucker testified that he responded to a homicide call on September 17, 2007. He said that he secured the scene and located witnesses. Officer Tucker maintained the scene until his lieutenant, the homicide bureau investigators, and the crime scene investigators arrived.

Hardin Edwards, a truck driver, testified that he arrived at his point of delivery on Knight Road in Memphis at 1:20 a.m. on September 17, 2007. He said that he was sitting in his truck doing paperwork when he saw a car "come out from where a truck was parked further down in the warehouse area," and he saw the same car return ten minutes later to park beside the rear tires of the truck on the driver's side. Mr. Edwards testified that he noticed the car because the rear window was broken and "had plastic wrapped around it." He said that when he went to bed at 1:50 a.m., the car was still parked in the same place. Mr. Edwards identified a picture of the car that he saw that day. When he awoke at 7:00 a.m., he saw a fire truck and police officers responding to the scene. After someone informed him that a truck driver had been killed, he told the police what he had seen earlier.

Theresa Rucker testified that in September 2007, she was working for Federal Express at 3835 Knight Road. She said that on September 17, 2007, she had to be at work at 2:15 a.m. Ms. Rucker testified that on that day, as she entered the parking lot, she noticed a turquoise car with the rear window broken because the car was driving fast and almost hit her. She said that she told police about the turquoise car later that day after seeing the police and the fire department around the victim's truck.

On cross-examination, Ms. Rucker testified that she saw a black male driving the car and a black person in the passenger seat, but she could not tell whether the passenger was male or female.

Memphis Police Officer Charles Cathey, a crime scene investigator, testified that he responded to the scene on September 17, 2007. He said that he observed a red tractor trailer with the driver's side window broken and saw glass on the truck's steps and small dent marks on the door, "like something had struck the truck." Officer Cathey testified that when he opened the door, he saw a red substance that appeared to be blood on the inside of the driver's door and broken glass on the driver's seat and the floor beside the seat. He also saw a substance that appeared to be blood on the outside of the driver's door and the steps of the truck. Officer Cathey found a human tooth on the floor of the truck. He said that there was a wire hanging down from the roof of the cab where a CB radio would typically be located. Officer Cathey testified that there was a large pool of blood between the front seats of the truck, and a small pool of blood and broken glass under the driver's seat. He located a

second human tooth on the driver's seat, underneath a seat cover. Officer Cathey said that the victim's body was lying on the floorboard of the cab.

On cross-examination, Officer Cathey testified that another officer processed the truck for fingerprints after they towed it to the impound lot. He said that the officer did not find any usable prints on the outside of the truck. He did not recall the officer processing the interior of the truck for fingerprints. Officer Cathey testified that he completed a form in which he reported that another officer processed a turquoise Saturn for fingerprints and found that the car was negative for prints.

Suleman Shamsuddin testified that in September 2007, he owned the BP service station at 4161 Winchester Road. He said that the video surveillance system was working on September 17 and that the store had an automated teller machine (ATM), but the ATM was out of currency. The state published the surveillance video from September 17, 2007, to the jury.

Sheila Dixon testified that in September 2007, she lived in the Wooddale Condominiums on Winchester Road. She said that on September 17, 2007, her boyfriend had wired her money, but she could not pick up the money transfer because she could not find her identification. When she saw the defendant, with whom she was friends, in the condominium complex, she asked him if he could get the money transfer for her with his identification. Ms. Dixon testified that while they were waiting for a ride to pick up the money gram, the defendant told her that he had shot a truck driver by mistake. She said that he offered her the truck driver's credit cards, and she said that the defendant also had a telephone, some papers, and a wallet with him. She testified that she did not take the credit cards, but that "[t]hey ended up in [her] purse." Ms. Dixon testified that the person who picked them up to take them to get the money gram told the defendant that he wanted "that hot CB" that the defendant had. She recalled seeing the CB in the car, and she said that she was familiar with CB radios because her boyfriend was a truck driver. Ms. Dixon testified that the police searched her apartment, and she gave them her purse, in which they found the credit cards. Ms. Dixon identified the Comdata credit cards that the defendant offered to her and which the police found in her purse. Ms. Dixon recalled that the defendant and his co-defendant gave her a ride sometime before September 17, and she testified that there was a sawed-off shotgun in between the seats and that they told her that "they [were] going to check on a trap." She said that checking on a trap meant to her that they were trying to make some money. Ms. Dixon said that the co-defendant drove the car and the defendant sat in the passenger's seat. She testified that she knew the defendant as Big Daddy and the co-defendant as Unk.

-6-

On cross-examination, Ms. Dixon said that the police came to her apartment looking for the defendant. She agreed that she told the police about the defendant's alleged confession to her while incarcerated on a forty-eight-hour hold.

Scarlett Renee Banks testified that on September 17, 2007, from her back door, she saw the defendant driving a burgundy truck and the co-defendant driving a turquoise car around the Wooddale Condominiums. She said that she went outside to where they had gotten out of their vehicles. Ms. Banks testified that the co-defendant handed her a gun and said, "'Huh go put this up.'" She took the gun inside of her home and put it behind her couch. Ms. Banks said that the gun was a short shotgun that had plastic and tape on it. She testified that she went back outside, and she saw the defendant and co-defendant in an empty apartment. She said that they had "a lot of blood on them" and that they were washing money that had blood on it. Ms. Banks testified that she gave the police consent to search her apartment on September 20, 2007. She said that the gun was not in her apartment when they searched it, but the police came back later and found the gun somewhere else.

Marcus Nelson testified that the co-defendant was his uncle. He testified that he gave the co-defendant a sawed-off shotgun on a Saturday, which was the 15th of the month but he could not recall which month. Mr. Nelson said that he identified the gun for the police on September 20, 2007, and he agreed that he gave the co-defendant the gun on the Saturday before September 20.

Tennessee Bureau of Investigation Special Agent Cervinia Braswell, a forensic scientist in the firearms identification unit, testified that she examined the shotgun found by police in the course of their investigation in this case. She explained that the shotgun was a single shot, 12 gauge, model and that the barrel was sawed off. Agent Braswell said that Hopkins and Allen manufactured the shotgun between 1898 and 1917. She testified that the force necessary to pull the trigger was three pounds, but a person could also fire the weapon if he pulled the hammer back without cocking it all the way and then let the hammer fall forward. She said that if a person hit the back of the gun with a mallet-type hammer with enough force, that the gun would fire. Agent Braswell clarified that if the hammer is fully cocked, the person must pull the trigger to fire the gun. Agent Braswell identified photographs, labeled as Exhibits 40 and 42, which she said depicted, respectively, pellets consistent with coming from a shotgun shell and cardboard shotgun shell wad. She testified that she could not identify pellets as coming from any particular shotgun. Agent Braswell said that for the medical examiner to find a shotgun shell wad in a victim during an autopsy, the muzzle of the shotgun "would have to [have been] fairly close" because the wads lose momentum as they travel.

Memphis Police Sergeant Anthony Mullins testified that he participated in the investigation in this case. He identified the shotgun found by police on September 20, 2007, on Boxdale Street. Sergeant Mullins said that the shotgun "was inside a plastic bag behind a board that was used to board up a vacant building." He stated that the co-defendant told the police that he gave the gun to Renee Banks. When the police did not find the gun in Ms. Banks's apartment, they took the co-defendant to the area and allowed him to speak with Ms. Banks, who eventually led them to the location of the gun.

Sergeant Mullins further testified that he interviewed the defendant on September 24, 2007. He said that the police had been actively looking for the defendant for five to six days. Sergeant Mullins testified that he and his partner, Sergeant Mason, advised the defendant of his rights prior to the questioning, and the defendant signed a waiver form. Sergeant Mullins said that the defendant did not appear to be under the influence of any intoxicants. The defendant told them that he went to Nashville, Tennessee, on Sunday, September 16, with a friend because his friend had an appointment for a urine test in connection with his probation. The defendant stated that they stayed in a hotel that night, went to the 9:00 a.m. test on Monday morning, and immediately returned to Memphis. Sergeant Mullins said that he showed the defendant pictures of several individuals with the same name as the defendant's friend with whom he allegedly went to Nashville as well as the pictures of the co-defendant and potential witnesses. Of all the pictures, the defendant said that he only recognized Sheila Dixon. Sergeant Mullins showed the defendant a still photograph taken from the BP station located at Winchester Road and Lamar Avenue that showed a "teal, blue-green Saturn [with] a big piece of plastic on the back windshield with tape on it," and the defendant stated that he recognized the vehicle. Sergeant Mullins could not recall whether the defendant said how he recognized the vehicle. He showed the defendant a second still photograph from the interior of the BP station that showed the defendant inside the store, and the defendant read aloud the time stamp on the photograph, which was September 17, 2007 at 2:26 a.m. The defendant admitted that he had not been in Nashville the evening of September 16 through September 17. He said that he met a man called Unk at the BP station, and they ran a scam with credit cards that Unk had. Sergeant Mullins said that they questioned him further about "that version of events" and then took a break from the interview. When they returned, the defendant told them that he wanted to tell them the truth. The defendant identified a photograph of the co-defendant as the man he called Unk. He said that the co-defendant approached him about making money. The defendant drove the Saturn, with the co-defendant as the passenger, to a truck stop on Knight Road. They approached a truck, and he let the co-defendant out of the car and drove away. After hearing a loud noise that he thought sounded like a gunshot, the defendant looked back at the truck and saw the co-defendant get into the truck, leave the truck, and return to the car. Sergeant Mullins testified that they told the defendant that they had previously talked to the co-defendant, who had told them his version of the events, and that they felt that the defendant "was still being

less than truthful with [them]." They told him that "[h]e could proceed and tell [them] the full truth, or go with what [they] had, so far." Sergeant Mullins said that, at that point, the defendant admitted to being the passenger in the car and to firing the shotgun. The defendant told them that "[h]e was just going to try to scare [the victim] out of his money with the gun, but it went off as soon as he tried to cock it." Sergeant Mullins testified that, after the defendant gave his oral statement, they advised him of his *Miranda* rights a second time and memorialized his statement in writing. In his written statement, the defendant admitted to being responsible for the victim's death and stated that he accidently shot him while trying to rob him. The defendant further stated that his co-defendant drove them to the victim's truck in a blue-green car with a busted back window, which the co-defendant had stolen. He said that he took a phone and a wallet from the victim. They left the area but then returned to the truck and took a CB radio. The defendant said that he was wearing a black shirt and blue jeans when he shot the victim, and he changed into a white shirt and jogging pants at the Wooddale Condominiums, leaving the black shirt and blue jeans in a vacant apartment. The defendant said that he "attempted to use [the victim's Visa credit card] at BP, but [he] didn't get a chance to use it." He said that the clothes he had on during the interview were the same clothes he changed into that day, so Sergeant Mullins collected the clothes as evidence.

Dr. Lisa Funte, a forensic pathologist and an assistant medical examiner, testified that lacerations on the victim's body indicated that the shooter fired through an intermediate target, and she agreed that glass could have been the intermediate target. Dr. Funte said that because the pellets did not have an upward or downward trajectory, the shooter held the shotgun level with the ground, and because the victim was inside a truck, the shooter most likely had to stand on the steps of the truck. Dr. Funte testified that a shortened shotgun fired from close range caused the victim's injuries and that a shotgun wound to his neck and chest caused his death.

The defendant offered into evidence Tennessee Bureau of Investigation reports showing that agents did not find blood on the defendant's clothing.

The state called Sergeant Mullins in rebuttal, and the court qualified him as an expert in crime scene investigation. He opined that, based on his analysis of crime scene photographs, a person could have entered the victim's truck twice without getting blood on his clothes if he had moved the victim's body out of the driver's seat.

Following the close of proof and deliberations, the jury convicted the defendant as charged, and he received a life sentence as a violent offender in the Tennessee Department of Correction.

**Analysis**

A. Suppression of Statement

Prior to trial, the defendant presented two motions to suppress his statement. His first motion alleged that he was under the influence of marijuana when interviewed by police; therefore, his waiver of *Miranda* rights was not voluntary, knowing, or intelligent. His second motion alleged that the court should exclude his statement because it arose due to an improper arrest. On August 21, October 2, and October 24, 2008, the court held suppression hearings and ultimately denied the defendant's motions. The defendant now argues that the trial court erred by denying his motions to suppress.

1. Standard of Review

When reviewing the trial court's decision on a motion to suppress, this court conducts a *de novo* review of the trial court's conclusions of law and application of law to facts. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). However, the trial court's findings of fact are presumed correct unless the evidence contained in the record preponderates against them. *See State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Moreover, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

2. Waiver of Rights

Both the United States and Tennessee Constitutions protect a defendant from compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. As a result, government authorities are prohibited from using statements made by the defendant during custodial interrogation unless the defendant has been previously advised of his constitutional right against compulsory self-incrimination and right to an attorney. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether waiver of a right is voluntarily and knowingly made is determined by the totality of the circumstances under which the right was waived. *See State v. Callahan*, 979 S.W.2d 577, 581 (Tenn. 1998). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Rather, coercive police activity is a necessary predicate to finding that a confession is not voluntary." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citations and internal quotations omitted). "The primary consideration in determining the admissibility of the evidence is whether the confession is an act of free will." *State v. Berry*, 141 S.W.3d 549, 577-78 (Tenn. 2004). A statement is involuntarily given

when "the behavior of the state's law enforcement officials was such as to overbear" the will of the accused and "bring about confessions not freely self-determined." *Berry*, 141 S.W.3d at 578 (citing *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544(1961)).

In particular to this case, it is well-established that a defendant's use of drugs or alcohol does not automatically render his subsequent confession involuntary. *See State v. Morris,* 24 S.W.3d 788, 805 (Tenn. 2000). In order for a court to suppress a statement given in such circumstances, the defendant's faculties must have been "so impaired that the confession cannot be considered the product of a free mind and rational intellect." *Id.* (quoting *State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980)). "The test to be applied in these cases is whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime." *Id.*

The testimony at the suppression hearing indicated that the defendant smoked marijuana at some point prior to his arrest. Sergeant Mullins estimated that three to five hours passed between when the defendant smoked marijuana and when they began the interview. All of the law enforcement officers who testified agreed that the defendant did not appear to be intoxicated. Importantly, the defendant not only was capable of making a narrative of past events, but - as shown by Sergeant Mullins's testimony - he created an elaborate story before eventually detailing how he shot the victim while robbing him. The defendant has not presented any evidence that would suggest that the defendant was so influenced by drugs that his "confession cannot be considered the product of a free mind and rational intellect." *See Morris*, 24 S.W.3d at 305 (citations omitted). Therefore, we conclude that the defendant has not carried his burden and is without relief as to this issue.

### 3. "Fruit of the Poisonous Tree" Doctrine

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A similar guarantee is provided in Article 1, Section 7 of the Tennessee Constitution:

> That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not

-11-

named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

"The essence of the prohibition against unreasonable searches and seizures . . . is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). A "basic principle of Fourth Amendment law" is "that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotations omitted). In Tennessee, overnight guests in a residence have a legitimate expectation of privacy and can challenge a search and subsequent seizure. *See State v. Transou*, 928 S.W.2d 949, 958 (Tenn. Crim. App. 1996). Under the "fruit of the poisonous tree" doctrine, evidence that is obtained through exploitation of an unlawful search or seizure must be suppressed unless the state demonstrates by a preponderance of the evidence that the search was "conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Simpson*, 968 S.W.2d 776, 780 (Tenn. 1998); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971).

In this case, the trial court ruled that the defendant's arrest was illegal, reasoning that the minor who answered the door did not have authority to give the police consent to search the house and, therefore, the police searched the house without a warrant, without consent, and without exigent circumstances. The trial court further ruled that under the authority of *New York v. Harris*, it did not have to exclude the defendant's statement because the police had probable cause to arrest the defendant and they did not obtain the defendant's statement by exploiting the illegal arrest. The defendant urges this court to determine that the Tennessee Constitution provides broader protection than the federal constitution, as interpreted by the United State Supreme Court in *New York v. Harris*. Alternatively, he contends that the facts of this case are distinguishable because, he argues, the police not only exploited the illegal arrest but also exploited the defendant's allegedly intoxicated condition at the time of that arrest in order to obtain a confession.

Another panel of this court, when confronted with a similar argument, summarized the *New York v. Harris* opinion as follows:

> In *New York v. Harris*, 495 U.S. 14, 21, 110 S.Ct. 1640, 1644-45, 109 L.Ed.2d 13, 22 (1990), the United States Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." The police officers in *Harris*, who had probable cause to arrest the

defendant for murder, went to his home without first obtaining a warrant, knocked on his door, displaying guns and badges, and were admitted by the defendant. *Id.*, 495 U.S. at 15, 110 S.Ct. at 1642. After having his rights read to him, the defendant agreed to answer the officers' questions and subsequently admitted killing the victim. *Id.*, 495 U.S. at 16, 110 S.Ct. at 1642. He was then arrested and taken to the police department where he was once again informed of his rights before signing a written inculpatory statement. *Id.* The Supreme Court concluded that because the police had probable cause to arrest the defendant, the second statement made at the station was not the fruit of their illegal entry into his home, and thus, need not be suppressed. *Id.*, 495 U.S. at 19, 110 S.Ct. at 1644. After noting its reluctance to adopt a "per se" rule that would limit any and all evidence resulting from a "chain of causation" that begins with an illegal arrest, the Court wrote:

> In light of these principles, we decline to apply the exclusionary rule in this context because the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime.

*Id.*, 495 U.S. at 17, 110 S.Ct. at 1643.

*State v. Jenkins*, 81 S.W.3d 252, 264 (Tenn. Crim. App. 2002).

In *Jenkins*, the panel determined that the defendant's arrest was illegal but, adopting the reasoning of *New York v. Harris*, further determined that the police had probable cause to arrest the defendant and that the exclusionary rule did not require the suppression of the defendant's subsequent statement. Likewise, another panel of this court ruled that *New York v. Harris* allowed the admission of a defendant's statement taken outside of his residence regardless of whether the police had valid consent to enter his residence because the police had probable cause to arrest the defendant. *State v. Steven John Chromik, III*, No. M2004-01865-CCA-R9-CD, 2005 WL 1081771, *7 (Tenn. Crim. App., at Nashville, May 6, 2005).

In this case, the defendant argues that this court should disregard the United States Supreme Court's holding in *New York v. Harris* because the court diverted from its *Brown v. Illinois*, 422 U.S. 590 (1975), line of cases and because, in other contexts, the Tennessee Supreme Court has ruled that the state constitution provided more protection than the federal context. We are not persuaded by the defendant's argument in this regard, nor by his assertion that the facts of this case are distinguishable because of the defendant's alleged

intoxication. The police had information from the co-defendant and other witnesses regarding the defendant's involvement, and they took the defendant's statement at the police station after ensuring that the defendant understood his *Miranda* rights. As previously noted, the defendant has not shown that he was so intoxicated as to have involuntarily waived his rights. Following *New York v. Harris* and other panels of this court, we conclude that the police had probable cause to arrest the defendant in his residence and that the exclusionary rule does not require the suppression of his subsequent statement taken outside of the residence.

## B. Admissibility of Evidence

The defendant contends that the trial court erred by admitting the victim's teeth into evidence. Specifically, the defendant argues that the trial court did not apply the proper balancing test to determine admissibility and admitted the evidence despite the state's inability to articulate why the teeth were probative. The state responds that the teeth were relevant, highly probative, and not unfairly prejudicial.

The determination of whether evidence is relevant is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. *State v. Porterfield*, 746 S.W.2d 441, 450 (Tenn. 1988). "[T]he modern trend is to vest more discretion in the trial judge's rulings on admissibility." *State v. Leach*, 148 S.W.3d 42, 63 (Tenn. 2004) (citing *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403.

In this case, the state introduced photographs of the interior of the victim's truck, which showed the location of two of the victim's teeth. When the state attempted to introduce the victim's teeth themselves into evidence, the defendant objected to the teeth's relevance. The state responded that the teeth were relevant because they showed that the victim was shot at close range and where the victim was sitting. The defendant responded that the pictures of the teeth were sufficient. The state explained to the court that the photographs were not clear and noted that the police officer had to point out where the teeth were in the photographs. The court ruled that the teeth were admissible. In our view, the state clearly articulated the relevance and probative value of the teeth, and the trial court did not abuse its discretion by admitting the teeth into evidence. The defendant is without relief as to this issue.

C. Expert Witness

For his final issue, the defendant contends that the trial court erred by allowing Sergeant Mullins to testify in rebuttal as a crime scene investigation expert when the state called him for the sole purpose of his testimony regarding blood spatter analysis. The state responds that the court's qualification of Sergeant Mullins as a crime scene investigation expert explicitly included his expertise in blood spatter analysis and that the court did not abuse its discretion in qualifying Sergeant Mullins as an expert.

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, provided the scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue. Tenn. R. Evid. 702. An expert may base his or her opinion upon facts or data imparted to or perceived by the expert prior to or at a hearing; the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts. Tenn. R. Evid. 703. If the underlying facts or data lack trustworthiness, the court shall disallow expert testimony based upon them. *Id*. Evidence and expert testimony regarding scientific theory must be both relevant and reliable before it may be admitted. *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997).

The trial court has broad discretion in resolving questions concerning the qualifications, admissibility, relevance, and competency of expert testimony. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). An appellate court should not overturn a trial court's decision in admitting or excluding a proposed expert's testimony unless it finds the trial court abused its discretion. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993).

Here, the state voir dired Sergeant Mullins prior to the court's ruling. He testified that he had been with the Memphis Police Department for twenty-one years, six of which were with the homicide bureau. Sergeant Mullins testified that he had received special certification in blood stain analysis through a forty-hour course taught by Paulette Sutton. He said that the police department has sent him to crime scenes specifically for the purpose of analyzing blood stains. Sergeant Mullins stated that courts in Shelby County have qualified him to testify as an expert in blood spatter and crime scene investigation on four to five occasions. Following voir dire, the defense counsel asked for clarification regarding whether the court would qualify Sergeant Mullins as an expert in crime scene investigation but not in blood spatter analysis. The court responded

> I think that they all go hand in hand. I mean, I am going to qualify him as an
> expert in crime scene investigation and I think he can testify to his training in

crime scene investigation and that includes his training under Paulette Sutton and blood spatters and interpretation of those . . . .

Based on the trial court's comments in qualifying Sergeant Mullins, we conclude that the court considered blood spatter analysis to be a part of crime scene investigation. The court also stated that Sergeant Mullins' qualifications allowed him to testify as to how the defendant could go into the victim's truck and not get blood on his clothes, which nullifies the defendant's argument on appeal that the trial court did not qualify Sergeant Mullins to testify regarding the one thing for which the state was calling him. Therefore, the defendant has not shown that the trial court abused its discretion in qualifying Sergeant Mullins as an expert, and he is without relief as to this issue.

## Conclusion

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____

J.C. McLIN, JUDGE